UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CINDY HURST,<br><br>                     Plaintiff,<br>     v.<br><br>IHC HEALTH SERVICES, INC., a Utah General Non-Profit Corporation d/b/a CASSIA REGIONAL MEDICAL CENTER; INTERMOUNTAIN HEALTHCARE, INC., a Utah General Non-Profit Corporation,<br><br>                     Defendants. | Case No. 4:10-cv-00387-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

Before the Court is a Motion for Summary Judgment (Dkt. 15) by Defendants IHC Health Services, Inc. and Intermountain Healthcare, Inc. (collectively, the Hospital). The Court heard oral argument on September 13, 2011. Having considered the parties' arguments, and being familiar with the record, the Court will deny the motion in part, and grant the motion in part, as more fully expressed below.

## BACKGROUND

Plaintiff Cindy Hurst was first employed with the Hospital in August 1988 as the Emergency Room Unit Secretary. *Perrigot Aff.* (Ex. B) at ¶ 3, Dkt. 16-2. Since that time, Hurst's assignments have changed a number of times. In March 2008, when

Hurst's primary assignment was in the Hospital recovery room, she began part-time work for the Harris Laser Care Clinic. *Hurst Dep.* (Ex. A) at 27:11-19, Dkt. 16-1. The Clinic was established, owned and operated by surgeon Eric Harris, MD. Dr. Harris staffed the Clinic with Hospital employees such as Hurst, through an agreement with the Hospital. *Perrigot Aff.* at ¶¶ 5-6. Hurst resigned her primary assignment in the recovery room in January 2009, and received a new primary assignment working "full-time" in the Clinic. *Hurst Dep.*, at 27:23-25. Hurst still maintained on-call shifts in the recovery room, roughly three times per month. *Id.* at 44:23 - 46:1.

All employees of the Hospital, including Hurst, are employed at-will, as provided in the Hospital's employee handbook. *Hurst Dep.* at 161:9-22; *Perrigot Aff.* at ¶ 17, Attachment 12 at 2, Dkt. 16-3 at 26.

In early January of 201, Hurst and Dr. Harris became involved in a disagreement about the propriety of having the Clinic's office manager perform patient IV-line maintenance. On January 8, 2010, Dr. Harris told the Hospital's Human Resources Director, Keri Perrigot, he no longer wanted Hurst working for him in the Clinic. *Harris Aff.* (Ex. C) at ¶¶ 7-8, Dkt. 16-4. On January 12, 2010, the day before a scheduled meeting with Perrigot, Hurst delivered a letter to Dr. Harris and to the Hospital's human resources office, resigning her position with the Clinic. *Hurst Dep.* at 136:11 – 138:25. Hurst contends that she was afraid she would be terminated because of the dispute over allowing employees to perform medical procedures which were outside their permissible scope of practice. *See Pl. St. of Facts*, Dkt. 23 at ¶¶ 7-17.

Effective January 13, 2010, the Hospital ended Hurst's work assignment at the Clinic. Since Hurst was not given another assignment to replace her work at the Clinic, this left her with only a part-time assignment consisting of three on-call shifts per month in the recovery room. Although she has requested additional shifts, Hurst has not been offered any extra shifts since January 13, 2010. *Hurst Dec.* ¶ 11, Dkt. 24. If called in to work, Hurst is paid $30.48 per hour; if she is not called into work during the on-call shift, she is paid $3.81 per hour. *Id.* ¶ 10. Hurst has maintained this minimal assignment so as to maintain her licensure as a nurse. Even if Hurst were to work all three shifts for which she is on-call, her hours – and thus her income – would be roughly one tenth of what she maintained prior to January 13, 2010, when she was employed at the Clinic full-time.

At Hurst's request, the Hospital removed references from her employee file which suggested that she had been "terminated" from her position with the Clinic; the Hospital informed Hurst it would consider her assignment change from the Clinic as a resignation. *Hurst Dep.* at 152:17 – 153:19; *Perrigot Aff.* ¶ 15.

## LEGAL STANDARD

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private

resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## ANALYSIS

**1. Retaliation In Violation of Public Policy**

The courts in Idaho have not addressed a claim for retaliation in violation of public policy where the adverse employment action falls short of full termination. Absent direct case authority on the issue before it, a federal court sitting in diversity must "apply the rule . . . it believes would be applied by the highest court of the state." *Owens v. White*, 380 F.2d 310, 313 (9th Cir. 1967). In cases concerning wrongful discharge in violation of public policy, the Idaho Supreme Court has explained that the action is an exception to the at-will employment doctrine, intended to protect employees whose discharge is motivated by their "[refusal] to commit unlawful acts, [performance of] important public obligations, or . . . exercise [of] certain legal rights or privileges." *Edmondson v. Shearer Lumber Prod.*, 75 P.3d 733, 737 (Idaho 2003); *see also Jackson v. Minidoka Irrigation Dist.*, 563 P.2d 54, 57 (Idaho 1977).

The first question here is whether Hurst was terminated. "[D]etermination of an employee's employment status is a factual finding." *Hummer v. Evans*, 923 P.2d 981,

986 (Idaho 1996).  Here, it is undisputed that Hurst submitted a letter of resignation (to both the Clinic and the Hospital) from her primary assignment in the Clinic.  *Hurst Dep.* at 136:11 – 138:25.  However, it is also undisputed that Dr. Harris had asked the Hospital to terminate Hurst's position with the Clinic, before receiving the resignation letter.  *Harris Aff.* at ¶¶ 7-8.  When the Hospital's personnel director contacted her, Hurst believed she was going to be terminated, so she resigned from the Clinic position to preempt termination.  *Hurst Dep.* at 152:5 – 153:19.

Viewing the facts in a light most favorable to Hurst, the Court finds that Hurst's resignation from her primary assignment in the Clinic could be construed as a constructive discharge.  *See Patterson v. State Dept. of Health & Welfare*, 256 P.3d 718, 725 (Idaho 2011) (citing *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1110 (9th Cir. 1998)).  In its summary judgment motion, the Hospital does not challenge whether Hurst's departure from the Clinic was a constructive discharge.  Instead, the Hospital asserts that a public policy wrongful discharge analysis is inapplicable here, because Hurst has maintained partial employment with the hospital.

The parties do not dispute that Hurst is, at least as of her filing of this action, still employed by the Hospital on a part-time "as-needed" basis, with recovery room nursing shifts.  Thus the question is, would the Idaho Supreme Court apply a public policy wrongful discharge analysis to Hurst's situation, where she was constructively discharged from her *primary assignment* in the Clinic, but maintains a limited *part-time assignment*?

The courts of other states are split on this issue. The California Court of Appeals has held that an adverse employment action taken in violation of public policy is actionable even if it falls short of a full discharge. *See Garcia v. Rockwell Int'l Corp.*, 232 Cal.Rptr. 490 (Cal. Ct. App. 1986) (abrogated by *Gantt v. Sentry Insur.*, 824 P.2d 680 (Cal. 1992) as to the holding that the policy violated need not be rooted in statute or constitution). In so finding, the court in *Garcia* reasoned that the pertinent inquiry is whether the public policy against retaliation was violated, "even though the ultimate sanction of discharge has not been imposed." *Id.* at 493. Courts in Ohio and Kansas have reached similar conclusions. *Powers v. Springfield City Schools*, 1998 WL 336782 (Ohio Ct. App. 1998); *Brigham v. Dillon Companies, Inc.*, 935 P.2d 1054 (Kan. 1997).

However, other states have rejected the expansion of the public policy exception recognized in Kansas, Ohio, and California. For example, the Seventh Circuit Court of Appeals – sitting in diversity – disallowed an action for wrongful demotion, noting the Illinois state courts' reluctance to extend the tort of wrongful discharge. *Ludwig v. C&A Wallcoverings, Inc.*, 960 F.2d 40 (7th Cir. 1992). Two years after *Ludwig*, the Illinois Supreme Court confirmed that an employee's action for retaliatory conduct based on demotion was not justified, in *Zimmerman v. Buchheit of Sparta, Inc.*, 645 N.E.2d 877, 882 (Ill. 1994). In its decision, the *Zimmerman* plurality expressed concern that increased judicial involvement in resolving workplace disputes would otherwise result. *Id.* In addition, the court noted the "guarded development and narrow construction of the tort of retaliatory discharge." *Id.* at 884.

The Washington State Supreme Court also refused to recognize a tort of wrongful transfer in *White v. State*, 929 P.2d 396 (Wash. 1997). Highlighting the need to balance an employer's right to operate its business with the importance of prohibiting wrongful action against an employee, *id.* at 407 (citation omitted), the court in *White* concluded that the proper balance would not be achieved by "[s]ubjecting each disciplinary decision of an employer to the scrutiny of the judiciary." *Id.* at 408. The Utah Supreme Court also declined to create a cause of action for harassment or discrimination short of discharge, in *Touchard v. La-Z-Boy Inc.*, 148 P.3d 945, 955 (Utah 2006). While characterizing retaliatory harassment or discrimination as "deplorable," the court in *Touchard* held that "it does not implicate a clear and substantial public policy to the same extent as a discharge." *Id.* [1]

Thus, the courts of other states are split. A majority of courts are reluctant to recognize a claim for disciplinary action in violation of public policy because it would result in excessive judicial interference in the workplace. However, even those courts which refuse to recognize such a claim express concerns that such a rule may lead to employers recognizing that they may retaliate against their employees with impunity, so long as their discipline stops just short of actual discharge. *See Zimmerman*, 645 N.E.2d at 885 (Bilandic, C.J. concurring). It is this very concern that has led a minority of courts to recognize a claim for wrongful disciplinary action in violation of public policy.

---

[1] The Hospital cites case law from Arizona, Colorado, Connecticut, Iowa, Maryland, Montana, and Oklahoma, in addition to the cases from Illinois, Utah, and Washington, in which courts have opted not to extend the wrongful discharge doctrine to include claims for retaliatory employment action short of termination. *Def. Reply*, Dkt. 27 at 3.

The Court concludes that the facts of this case make it unnecessary to decide whether the Idaho Supreme Court would accept or reject the majority view that there is no public policy wrongful discipline claim for routine disciplinary actions, such as demotion, transfer and even a reduction in hours. Rather, the Court concludes that the Idaho Supreme Court would regard the actions taken against Hurst because of her complaints about the Clinic's practices as amounting to far more than routine discipline; they would regard them as being tantamount to a complete discharge. As noted above, Hurst's real employment with the Hospital was with the Clinic. While she also retained an as-needed, on-call position in the recovery room, it amounted to no more than three shifts per month and was accepted by her as a means of keeping her nursing license current. Her constructive termination from the Clinic position deprived her of full-time income, resulted in a loss of any meaningful employee benefits, and left her with a drastically reduced income.[2] This, in effect, amounts to a termination of employment.

Counsel for the Hospital suggests that if an employee maintains any form of employment with her employer, she is not terminated and therefore cannot argue that a wrongful discharge occurred. However, the Court concludes that this focuses on the wrong event. The question is not whether she continues to maintain some form of employment with the Hospital – no matter how trivial. Rather, the relevant question is,

---

[2] Counsel for Defendant acknowledged that Hurst earned roughly $1,570 between January and July of 2011, which amounted to roughly 30 hours of work in total for that period – or about 5 hours of work per month..

"Was she discharged?" With regard to Hurst's employment with the Clinic, the answer to that question is clearly "yes."

Such a holding is necessary to avoid the specter suggested by both the minority view and the dissenting opinions offered by state court justices in states which have adopted the majority view. Holding otherwise would permit an unscrupulous employer, who wishes to punish an employee for engaging in some form of protected activity, to act without legal consequence so long as the employee is offered some form of continued employment – no matter how insignificant. On the other hand, the Court's decision also avoids the concern expressed by the majority view that recognizing a claim of wrongful discipline in violation of public policy will inappropriately inject the court system into the workplace. The Court does not envision that its holding will have application outside of the rare circumstances presented here. It certainly would not extend to routine disciplinary action allegedly taken to punish an employee. That is another question for another day.

For the reasons stated, the Court will deny the Hospital's motion for summary judgment as to Hurst's claim for public policy wrongful discharge.

### 2. Implied Covenant of Good Faith and Fair Dealing

In Idaho, the covenant of good faith and fair dealing is implied in all contracts, including those for employment-at-will. *Cantwell v. City of Boise*, 191 P.3d 205, 213 (Idaho 2008). The covenant does not provide rights beyond those available under a negotiated contract. *Id.* at 214. Rather, it requires parties to perform in good faith, the

obligations existing under the contract. *Id.* at 213. Breach of the covenant occurs where a party "violates, qualifies[,] or significantly impairs any benefit or right of the other party under an employment contract." *Id*. at 213-14. The paradigmatic example of a breach of the covenant is where an employer terminates an at-will employee weeks before the employee's retirement vests in order to avoid paying the employee's retirement benefits; although the employment contract permits termination without cause, termination to avoid paying benefits due the employee would amount to a breach. The test for breach of the covenant is objective, and considers the reasonableness of the parties in carrying out the contract. *Independence Lead Mines v. Hecla Mining Co.*, 137 P.3d 409, 414 (Idaho 2006); *Jenkins v. Boise Cascade Corp.*, 108 P.3d 380, 390 (Idaho 2005).

The contractual term at issue need not be express, but may be implied. *Cantwell*, 191 P.3d at 213-14. Hurst contends that her at-will employment contract had a limitation implied by the Clinic's annual requirement that she complete compliance questionnaires regarding her duty to be accountable for all laws and rules governing her Clinic position. *Hurst Dec.* at ¶ 3, Dkt. 24. According to Hurst, this requirement created an implied contractual term that she would not face adverse employment consequences for advocating adherence to laws and regulations governing her work.

To determine the validity of an implied contractual term, the court considers whether, "from all the circumstances surrounding the relationship, a reasonable person could conclude that both parties intended [the limitation]." *Metcalf v. Intermountain Gas*

*Co.*, 778 P.2d 744, 746 (Idaho 1989). It is correct that promises made in employee manuals can support valid and enforceable terms of an employment contract. *Harkness v. City of Burley*, 715 P.2d 1283, 1287-88 (1986). However, the Idaho Supreme Court has held that an implied-in-fact contract will not be found, based on language in an employee manual, where the manual explicitly denies the employer's intent that it be part of the employment contract. *Jenkins v. Boise Cascade Corp.*, 108 P.3d 380, 388 (Idaho 2005). Here, language in the Hospital's employee handbook provides that the "policies and procedures expressed in these handbooks or any other Intermountain Healthcare materials, which may be used from time to time, do not create a binding employment contract or any other agreement between [the employee] and Intermountain Healthcare." *Perrigot Aff.* at ¶ 17, Attachment 12.

Also, Hurst's argument presumes that the Clinic and the Hospital are one and the same. Even without the Hospital's express disclaimer in its handbook, the *Clinic's* requirement for Hurst to complete compliance questionnaires fails to demonstrate that the *Hospital* intended to limit Hurst's at-will employment. Without this contractual limitation, Hurst's breach of covenant claim is simply an allegation that her termination was in bad faith. This allegation alone is duplicative of Hurst's public policy wrongful discharge claim. Accordingly, the Court will grant the Hospital's motion for summary judgment on this issue, and dismiss Hurst's claim for breach of the covenant.

3.  **Idaho Wage Claim Act**

Under Idaho's Wage Claim Act, an employer must "pay or make available at the usual place of payment all wages then due the employee" within 10 days from the dates of termination of the employment or the next regularly scheduled payday, whichever is earlier. I.C. § 45-606(1). Wages under the Wage Claim Act are defined as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece or commission basis." I.C. § 45-601(7). According to Hurst, she is entitled to her earned "paid time off," under the Act, in light of her termination from her assignment with the Clinic. *Compl.*, Count I, Dkt. 1-2.

The purpose of Idaho's Wage Claim Act "is to insure that employees receive compensation due and owing to them upon termination of their employment." *Hales v. King*, 762 P.2d 829, 832 (Idaho Ct. App. 1988). It is undisputed that Hurst has been paid for every hour worked. Hurst's claim under the Wage Claim Act concerns paid time off. The Hospital's paid time off policy provides that "[e]mployees who terminate or retire from employment with [the Hospital], or become permanently disabled from work, will be paid for accrued but unused Paid Time Off Hours." *Paid Time Off Policy* at ¶ 10.1, Attachment 8 to *Perrigot Aff.* (at ¶ 12). The implication is that an employee's wages are due and owing to them when they are no longer working for the Hospital on any basis. The Court here finds that Hurst's interpretation of the Act, and of the Hospital's policy regarding payment of paid time off implausible, or at best unreasonable.

No triable issue of fact remains whether Hurst's departure from the Clinic triggered her entitlement to paid time off under the Hospital's policy or Idaho's Wage

Claim Act. The Court finds Hurst was not so entitled. Accordingly, the Court will grant the Hospital's motion for summary judgment on this issue, and dismiss the claim.

## ORDER

**IT IS ORDERED:**

1. Defendant's Motion for Summary Judgment (Dkt. 15) is **GRANTED** in part, **DENIED** in part.

2. Plaintiff shall be allowed to proceed as to her claim of public policy wrongful discharge; as to this claim, Defendant's Motion is **DENIED**.

3. As to Plaintiff's claims for breach of the implied covenant of good faith and fair dealing, and for violation of Idaho's Wage Claim Act, Defendant's Motion is **GRANTED**, and these two claims are **DISMISSED** with prejudice.

DATED: September 15, 2011

B. Lynn Winmill
Chief Judge
United States District Court